IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

UNITED STATES OF AMERICA

v.                                                            Criminal No. 2:09cr00043-KS-MTP

CASSANDRA THOMAS

**REPLY TO UNITED STATES' RESPONSE TO MOTION FOR DISMISSAL BASED ON RULE OF LENITY, ABSENCE OF LICENSURE REQUIREMENT, AMBIGUITY CONCERNING "DIRECT SUPERVISION" REQUIREMENT, AND "INCIDENT TO" BILLING ISSUES**

**I.     AS THE FIFTH CIRCUIT HAS HELD, THE RULE OF LENITY APPLIES IN CONTEXTS OF AMBIGUOUS REGULATIONS AND CONTRACTS IN ADDITION TO STATUTES**

The Government leads their brief with the completely mistaken notion that the Rule of Lenity only applies to the criminal statutes on which the prosecution is based.  The Government begins by quoting *United States v. Garrett,* 984 F.2d 1402, 1411 (5th Cir. 1993), which notes that lenity "requires ambiguous *criminal statutes*… be construed in favor of the defendant."[1]   United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 2 (with the italics supplied by the Government and not in the original).

By italicizing the words "criminal statute" in the quote, the Government attempts to create the impression that *Garrett* limits lenity challenges to criminal statutes.  The Government then moves on to ridicule and to observations like "Neither of these statutes are ambiguous and Thomas does not allege that they are."   *Id.*   By "these statutes," the

---

[1]*Garrett* is interesting because it illustrates the way lenity interacts with the mens rea requirement, a general requirement to criminal statutes that Garrett calls "the default rule of requiring some mens rea."—*Id.*—that someone know and have reason to know he was violating the law comports with the so-called rule of lenity.  *Garrett* states that the requirement that someone know he or she are breaking the law is the fundamental principal behind the rule of lenity.  It says nothing about whether lenity analysis is limited to whether a statute is clear or ambiguous.

Government means the two statutes that are the basis for the counts charging Dr. Thomas in the indictment, 18 U.S.C. §§286 and 641, which are charged, respectively, in Counts 1 and 12.

In a §641 prosecution, the Fifth Circuit has expressly held that the Rule of Lenity applies to construction of Government regulations and contracts. *United States v. Hartec Enterprises, Inc.,* 967 F.2d 130, 133-134 (5th Cir. 1992). In that case, Hartec Enterprises contracted with the Government for manufacture of wire mesh screens. The contract expressly incorporated regulations that the Government claimed vested ownership of the screens in the Government because they were made with advance payments under the contract. Hartec sold the screens, and was indicted under §641 for conversion of Government property.

Obviously, §641 unambiguously criminalizes conversion of Government property—"Whoever… knowingly converts to his use … any…thing of value of the United States" (the basis for the indictment in *Hartec*). §641 clearly does so just as it unambiguously criminalizes "embezzl[ing], steal[ing], purloin[ing]… money… of the United States", which is the basis for Count 12 of the indictment in this case. *See* Indictment at 15 (Docket No. 1) (charging that Dr. Thomas and others "did steal, purloin, and knowingly convert … funds belonging to the United States…."). The Fifth Circuit in *Hartec* recognizes that the clarity of the statute is not the end of the question: In *Hartec,* the inquiry was whether, in the context of the contract and regulations, Hartec would have known he was converting Government property. And, because the regulations were ambiguous, the Fifth Circuit, in an opinion by Judge Edith Jones, reversed Hartec's conviction.

The regulation in *Hartec,* the Federal Acquisition Regulation, was required to be a part of the contract and seemed to speak pretty clearly: "Title to the property described…

2

shall vest in the Government. The vestiture shall be immediately upon the date of this contract…" *Id.* The regulation included in its scope "Parts, materials, inventories, and works in progress." *Id.* The Court of Claims had held, however, that this provision did not vest title in the normal sense and was more in the sense of a lien, but also noted that "the Government's right to possess such property cannot be questioned…" *Hartec,* 967 F.2d at 132-133.

In its lenity analysis, the Fifth Circuit cautioned against applying a civil case in a lenity analysis because in the civil case, "no person's liberty hinged on the court's interpretation of the [contract and regulation's] title vesting provision." *Id.* at 133. The issue in *Hartec,* the Court held, presented

> a paradigmatic case for application of the rule of lenity. The rule of lenity compels us to construe ambiguous criminal statutes in favor of lenity. The rule promotes fair notice of prohibited conduct and reduces the likelihood that unintentional criminal conduct will be penalized. Although the rule does not require that we give the statute its narrowest construction, we find that under the facts now before us, the coupling of the title vesting provision with its inconsistent interpretations in the courts and §641 did not provide Aceves with notice that he could be criminally liable for sale of the wire mesh panels.

*Id.* at 133 (internal citations omitted). In other words, in the contractual and regulatory context, application of §641 violated the rule of lenity—exactly the argument that Dr. Thomas is making in the instant motion.

Even more startlingly, a case cited in passing by the Government applies the Rule of Lenity to an ambiguous regulation *and* reverses a conviction in part because of ambiguity of a statute and an ATF regulation. *United States v. Orellana,* 405 F.3d 360, 370 (5th Cir. 2005)(cited in United States Response to Defendant Thomas' Motion to Dismiss (Document 248) at 2, and holding: "Given the ambiguity of section 922(g)(5)(A), the questionable interpretation and weight of the ATF regulation, and the absence of binding case law on point, we are constrained to apply the rule of lenity in this case."). The Court in

3

*Orellana* goes on to quote Justice Holmes on the purpose of the rule, thoroughly refuting the Government's contention in its brief (United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 9) that the question is whether the individual defendant, Dr. Thomas, sat down and pondered the regulations:

> The policy underlying the rule of lenity is that of fairness to the accused:
>
>> Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.

*Orellana,* 405 F.3d at 371 (Quoting *McBoyle v. United States,* 283 U.S. 25, 27 (1931)(Holmes, J.)). Of course, this is also clear in *Hartec,* in which it was obvious that the machine shop operator-defendant had not sat and reflected on the applicable regulations and contract provisions.

Other courts have gone so far as to apply lenity to hold that a prosecution cannot be based in part on an ambiguous court rule. *United States. v. D'Alessio,* 822 F.Supp. 1134, 1145-46 (D. N.J. 1993) (court rule did not provide sheriff "fair warning" and therefore Honest Services prosecution under 18 U.S.C. §§1341 and 1342 violated Rule of Lenity). The Court therefore dismissed counts of the indictment involving the state court rule: "Because there is a distinct and reasonable possibility that the inclusion of Rule 1:16-2 in counts one through three infected both prongs of the indictment's alleged mail fraud scheme, the court must dismiss these counts in their entirety." *Id.* at 1146. Similarly, in *United States v. Ribas Dominicci,* 899 F.Supp. 42, 44-45(D. Puerto Rico, 1995), the district court followed the Fifth Circuit case of *Hartec* to dismiss an indictment similar to that in *Hartec*. These two cases, in both of which all or parts of indictments were dismissed because of the Rule of Lenity, refute the Government's suggestion that the proper approach in this case is to see

4

how the proof develops before ruling on the Lenity issue. *See* United States Response to Defendant Thomas' Motion to Dismiss (Document 248) at 12 (Arguing this is "a question based on the totality of the evidence. The issue is not appropriate for dismissal based on lenity."). Similarly, in *United States v. Apex Oil Co.,* 132 F.3d 1287, 1291 (9th Cir. 1997), the court found a regulation in the C.F.R. uncertain as to the meaning of the words "oil" and "residue," and whether discharge of the "muck" in an oil tanker after it was cleaned—which clearly contained oil—violated a statute against discharge of oil or residue of oil. The Court found it unclear whether the muck was "oil" or "residue," and held: "In the fact of uncertainty as to the meaning of what is forbidden, the rule of lenity requires dismissal of the indictment." The question is not one of the *evidence*—facts that may come in at trial—but rather whether regulatory materials clearly told one the line that divided criminal from non-criminal conduct, which does not require examining "the totality of the evidence," only the regulatory material discussed in these briefs.

Beyond the meritless claim that lenity does not apply except to statutes, the Government relies on civil cases, which, as recognized in *Hartec,* must work differently because "no person's liberty hinged on the court's interpretation of the … provision." *Hartec,* 967 F.2d at 133. The due process considerations are radically different. Thus *Administaff Cos. v. N.Y. Joint Bd.,* 337 F.3d 454 (5th Cir. 2003) and *Perone v. GMAC,* 232 F.3d 433 (5th Cir. 2000), cited in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 2, provide little or no guidance about how the Rule of Lenity operates in this case. In the *Administaff Co.* case, company sought a declaratory judgment action that it was not liable to employees for possible violations of the Worker Adjustment and Restraining Notification Act. *Perone* has only a passing reference to lenity, noting that unless a statute is opaque or ambiguous, there is no need to resort to canons of construction,

5

including lenity. Nothing in these cases shed light on this context, involving, first, a criminal case, and, second, the interaction of statutes and a complex regulatory scheme.

The Supreme Court's continuing commitment to the Rule of Lenity was affirmed in *United States v. Santos,* 553 U.S. 507, ___, 128 S.Ct. 2020, 2022 (2008), in which the question was whether a money laundering statute's use of the word "proceeds" meant "receipts" or "profits." The Court held:

> Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. See *United States v. Gradwell,* 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917); *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); *United States v. Bass,* 404 U.S. 336, 347-349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly proscribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead. Because the "profits" definition of "proceeds" is always more defendant-friendly than the "receipts" definition, the rule of lenity dictates that it should be adopted.

*Santos,* 128 S.Ct. at 2025. It is clear from the Fifth Circuit and Supreme Court holdings on the Rule of Lenity that it applies in exactly this context.

## II.  THE MATERIAL CITED BY THE GOVERNMENT DOES NOT ESTABLISH THAT THE REGULATIONS AND STATUTES ARE CLEAR

On page 4 of the Government's response to Cassandra Thomas' Motion in Limine concerning manuals, newsletters, and other informal interpretive materials (Docket Entry 247), the Government concedes that the United States Supreme Court has held that agency interpretations in policy statements, agency manuals, and enforcement guidelines are not entitled to the "force of law," citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

6

Such informal interpretive materials are entitled to "deference," *id.*, but only if the Court finds, usually in a civil context, that the agency's "interpretation" is "reasonable."

Despite this, in responding to Cassandra Thomas' Rule of Lenity motion, the Government continually starts with and cites throughout its response agency interpretative materials – arguing how clear portions of those materials are – out of context.

Examples of informal, interpretive materials cited by the Government include: (1) "Revisions to Payment Policies" based on a 5-year review attached as Exhibit A to the Government's response; (2) a United Healthcare "article" attached as Exhibit B to the Government's response; (3) a Local Medical Review Policy (or "LMRP") written by United Healthcare and cited on page 6 of the Government's response; and (4) the Medicare Carrier's Manual quoted at length on page 7 of the Government's response.

In order to determine if there is any ambiguity or contradiction for purposes of the Rule of Lenity, the place to start is with the federal statute, 42 U.S.C. Section 1395y(a)(2) and three formally adopted federal regulations cited in our Motion – 42 C.F.R. Sections 410.60, 410.26, and 410.32.

The Government tries to argue that there was no ambiguity in applicable regulations – despite the Government's concession in the Federal Registry excerpt and OIG report attached as Exhibits 4 and 5 to the Motion for Dismissal – that physicians across the country and Medicare and Medicaid's own carriers and contractors like United Healthcare and Cahaba differed widely in their interpretation of the applicable federal statute and regulations prior to the rule changes effective in July 2005, after Statewide had ceased operations. In those publicly available materials, the Government admits that its contractors and agents were issuing conflicting "interpretations" that required "clarification."

7

To determine whether or not any of the informal interpretative materials issued by Medicaid and Medicare's carriers, contractors, and agents, such as United Healthcare and Cahaba, are entitled to any "deference" in this criminal proceeding, this Court must start with the applicable federal statutes and regulations.

For example, on the issue of whether the "direct supervision" concept clearly required that physicians be present in a patient's home, we ask only that the Court look at the "plain language" of 42 C.F.R.§410.60, 410.26, and 410.32 <u>before</u> and <u>after</u> the 2005 rule change. In 2005, a cross-reference was added in 410.26 to the direct supervision requirements in §410.32(b)(3)(ii). A review of the amendments to those regulations reveal that a "direct supervision" requirement was clearly created for services provided in an "office suite," but that "direct supervision" in other contexts, like the situation here, was simply not addressed.

The parts of the Government brief that relate to the actual content of the regulations have to be read with great care, because there is more than a small amount of "bait and switch" to the analysis. In United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 4, the Government quotes 42 C.F.R. §410.26, which provides that Medicare would pay for "services… incident to a physician's professional services… if the services… are of the type that are commonly furnished in a physician's office or clinic…." Note what this says, and what it does not say: It says Medicare will pay for the kind of services "commonly furnished in a doctor's office." ***It does not say the services have to be performed in the office.*** If, instead of saying "they should be that *kind* of service," the regulation said "they must be performed in the office," that would have ended this discussion. The next material quoted by the Government is from the Federal Register, and states that, for a claim "for an incident to service, the physician is stating that he or she

8

either performed the service or directly supervised the auxiliary personal performing the service." United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 4. This does not say where the doctor was supposed to be when the service was performed. Further, those very materials contemplate that "incident to" means different things in different settings. The portion of the Federal Register included with the Government response distinguishes what is required for services and supplies to be "incident to" when furnished in physicians' offices as opposed to in a hospital setting.

> Section 1861(s)(2)(A) of the Act authorizes coverage of services and supplies… furnished incident to a physician's service. These drugs and biologicals are commonly furnished in physician's offices without charge or included in the physician's bills. *This statutory "incident to" benefit differs from the "incident to" benefit in the hospital setting…*

Medicare Program: Revisions to Payment Policies and Five Year Review of And Adjustments to the Relative Value of Units, 66 Fed.Reg. 55246, 55267 (Nov. 1, 2001) (Exhibit A to United States' Response to Defendant Thomas' Motion to Dismiss (Document 248)).

The Government next takes the definition of direct supervision in one specific setting—the office setting—and by misleading omission, makes it sound as if that definition applies to *all* settings. The regulation (which was quoted and discussed in Dr. Thomas' Motion at 12) states:

> *Direct supervision* in the office setting means that the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean the physician must be present in the room when the procedure is performed.

42 C.F.R. 410.32(b)(3)(ii). Note what this is saying: In one particular context—the office setting—direct supervision means the physician must be present. *This does not say a word about what direct supervision means in other contexts.* By literally changing the language

9

through partial quote and misleading paraphrase, the Government attempts to make this language say something far different:

> At all times relevant to the indictment, "direct supervision" required the physician to be physically *present* at the location where the services were rendered, at the time the services were performed. Direct supervision means "the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure."

United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 4. By moving the quotation marks and by omission, the Government changes the meaning of the regulation. The actual language: "Direct supervision *in the office setting* means the physician must be present" becomes "Direct supervision [omitted ellipses] means 'the physician must be present". This conversion of a specific definition applicable to the office setting to a general definition applying everywhere is the lynchpin of the Government's analysis, and it makes no sense. The language says where the physician must be ("in the office suite") where the services are rendered in his or her office, but says nothing about where the physician must be when services are rendered elsewhere. The absurdity here (to use the Government's word[2]) is the attempt to take a definition about what happens in office suites and pretend it talks about other settings.

Pretending to have made the point, the Government then cites a newsletter and another publication, which both say that the physician must provide "direct supervision" of physical therapy services rendered in the home. United State' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 5-6, citing Exhibit B and C[3] to the United

---

[2]The Government suggests that this "office setting" language should be read to govern services in the home and that any other reading of the regulation is "absurd," United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 8.

[3] Exhibit C is labeled "Exhibit 5" but is on the Court's docket and referred to in the Government Response as Exhibit C.

States' Response to Defendant Thomas' Motion to Dismiss (Document 248). *Nowhere do these documents suggest what direct supervision means in the home therapy context, or that it is the same as in the office context, or that the physician must be present in the home.*[4]

The Government's discussion of the actual content of the regulations relies heavily on an unpublished Fifth Circuit opinion from 2008, *United States v. Prince,* 273 Fed. Appx. 346 (5th Cir. 2008), which, by operation of the Fifth Circuit's rules, may be cited but is not precedent. Fifth Circuit IOP 47.5.4 ("Unpublished opinions issued after January 1, 1996 on or after January 1, 1996 are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case..."). *Prince* is discussed in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 12. Beyond this important cautionary principle, the case itself says almost nothing about the issues raised in the Dr. Thomas Lenity Motion. The defendant in *Prince* failed to renew a motion for acquittal after presenting his case, which meant that his sufficiency of the evidence argument had to fail unless the "record [was]… devoid of evidence of guilty or the evidence must be so tenuous as to be shocking." *Prince,* 273 Fed. Appx. at 348. The Court then went on to discuss at great length the facts in the case--Prince's role in the billing for his health care business, the manner in which he billed for services, that his partner had inquired about how they billed and been told it was wrong, and that issues were raised by doctors about

---

[4] A related point does not follow. 42 U.S.C. §410.26 provides that Medicare Part B pays for services incident to the services of a physician, and that they must be furnished in a noninstitutional setting. The Government notes that a noninstitutional setting is everything other than a hospital or skilled nursing setting. United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 7-8. From this language, which nowhere suggests that direct supervision is the same in all noninstirutional cotexts, the Government leaps to the conclusion that it *does* establish that direct supervision was the same in all noninstitutional contexts as in the office setting. United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 7-8.

11

questions being raised about bills. *Id.* at 349-50. The case does not contain *any* citation to the particular regulations involved, discussion of what they might mean, or reference to the Rule of Lenity, which was clearly not involved at all in the case. Beyond its lack of precedential value under Fifth Circuit IOP 47.5.4, it quite simply says nothing that sheds any light on the issues raised in the Dr. Thomas Lenity Motion. The Government seems to be citing the case to reassure the Court that it has prevailed in a similar prosecution.

The Government also attempts to make much out of two civil cases that both involve the specific application of the "incident to" requirement in the context of services performed in a doctor's office suite, which returns us to the Government's selective omissions, discussed, *supra,* at 9-10. *Landau v. Lucasti,* 680 F.Supp. 659 (D. N.J. 2010) (cited in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 10-11) and *Downtown Medical Center/Comprehensive Health Care Clinic v. Bowen,* 944 F.2d 756 (10th Cir. 1991) (cited in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 10). As noted above, civil cases involve a fundamentally different context because "no person's liberty hinged on the court's interpretation of the … provision." *Hartec,* 967 F.2d at 133. The Government cites *Downtown* as "refut[ing] Thomas' contention that the 'incident to' regulations did not apply to physical therapy until July 2005." United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 10. *Downtown* involves incidental services in an office suite. It is more difficult to understand what the Government thinks *Landau* contributes to its argument, except language that states that, after January 1, 2002, regulations "unambiguously require the doctor to be physically present in the office suite while services are rendered." (cited in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 11. This does not speak to services performed outside the office suite.

## II. THE GOVERNMENT IS NOW CONCEDING THAT PART OF THE INDICTMENT THAT ATTEMPTED TO CHARGE USE OF UNLINCENSED OR UNQUALIFIED PERSONNEL

The Government begins its discussion of licensing with yet another misleading quote, of the post-2005 version of 42 U.S.C. §410.50(a)(3)(iii)(2008), cited in United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 13. This contains language from a 2005 amendment not applicable to this case that requires the person rendering physical therapy have the training and skill of a physical therapist. There was no requirement during the period at issue in this case.

In the preliminary parts of the indictment, the issue of qualifications is discussed several times. Paragraph 9 of the Indictment asserts that "Physical therapy statutes, rules, and regulations were and are administered by the Mississippi State Board of Physical Therapy and prohibit any individual who is not properly licensed from practicing physical therapy within the State of Mississippi, in accordance with Section 73-23-35 of the Mississippi Code of 1972, Annotated." Indictment at 3 (Docket No. 1) Paragraph 15 refers to the same statute, and Paragraph 16 repeats that these statutes "prohibit any individual who is not properly licensed from physical therapy." Indictment at 5 (Docket No. 1). In Count 1, Paragraph 31, Dr. Thomas and others are charged with "order[ing] medical treatments for patients which they knew, or should have known, the employees STATEWIDE PHYSICAL MEDICINE GROUP, INC., were not trained or otherwise qualified to render." Indictment at 9 (Docket No. 1). In its brief, the Government *entirely abandons* any theory charging Dr. Thomas based on the licensure of the employees delivering services, pretending this was never charged in the indictment:

> The licensure argument raised by Dr. Thomas is moot, because there is no *federal* requirement that a person performing physical therapy services "incident to" the services of a physician be a "licensed" physical therapist. What is required by *federal* regulation, is that any person rendering physical

13

> therapy "incident to" the services of a physician have the training and skill of a physical therapist. 42 C.F.R. §410.60(a)(3)(iii)(2008). However, the Government has chosen not to pursue this theory of liability, opting instead to focus on the non-existence of direct supervision, and the overutilization of the CPT code.

United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 13. This is a major concession, forced by a reading of the regulations quoted in Dr. Thomas' motions: The Government is abandoning those parts of the Indictment and Count 1, alleged in paragraphs 9, 15-16, and 31 on pages 3, 5, and 9, that contain allegations about the qualification of the therapists. If the Government's case is, as the Government asserts, limited to the questions of "direct supervision" and the billing of "units," there is no possible relevance to the proof the Government plans to offer that "the defendant physicians were prescribing treatments…that the employees of Statewide were never trained to perform" and that "the referral of patients… was a deviation from the standard of care." United States' Response to Defendant Thomas' Motion to Dismiss (Document 248) at 14.

## CONCLUSION

For the reasons states in our original motion and this reply, based on due process rights and the rule of lenity, this Court must dismiss the indictment against Dr. Casandra Thomas

This the 26th day of May, 2010.

                Respectfully submitted,

                COUNSEL FOR CASSANDRA FAYE THOMAS

                s/ Joyce Freeland
                      Joyce Freeland
                      Bar No. 102183

                                                                      s/    T.H. Freeland, IV  
                                                                        T.H. Freeland, IV  
                                                                        Bar No. 5527

Freeland & Freeland, Lawyers  
1013 Jackson Avenue  
Box 269  
Oxford, MS  38655  
(662)234-3414  
Fax:  (662) 234-0604

## **CERTIFICATE OF SERVICE**

I, Joyce Freeland, hereby certify that on May 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties of record.

This the 24th day of May, 2010.

/s/ Joyce Freeland
Joyce Freeland